**Carl Post, OSB No. 061058**
carlpost@lawofficeofdanielsnyder.com
**John Burgess, OSB No. 106498**
johnburgess@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 SW Broadway, Suite 2400
Portland, OR 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **DAVID SMITH, JR.**, personal representative for the Estate of David Smith,<br><br>Plaintiff,<br><br>v.<br><br>**OREGON DEPARTMENT OF CORRECTIONS**, an agency of the State of Oregon; **JOHN and JANE DOES I-X,**<br><br>Defendants. | Case No. 6:23-cv-1053<br><br>**COMPLAINT**<br><br>Wrongful Death, Negligence, and 42 U.S.C. § 1983<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.   This is an action arising from David Smith, Sr.'s wrongful and unnecessary death and the Defendants' negligence and deliberate indifference to his medical condition and conditions of confinement. Defendants willfully disregarded plaintiff medical condition. As a result, David Smith died from metastatic cancer while in the custody of Defendant Oregon Department of Corrections (ODOC). The claims herein include all claims for damages available

under Oregon and federal law to David Smith, Sr., his Estate, and all statutory and actual beneficiaries.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C. § 1983, the 8th Amendment to the United States Constitution, and supplemental state law negligence claims.

3. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, supplemental jurisdiction of the state law negligence claims pursuant to 28 USC § 1367.

4. Venue is in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claim arose in this Judicial District. The conduct that is the subject of this lawsuit occurred in Marion County, Oregon.

## PARTIES

5. Plaintiff David Smith, Jr. (hereafter "plaintiff") is the duly appointed personal representative of the Estate of David Smith, Sr. (hereafter "Smith"). Plaintiff is Smith's son. He resides in Medford, Oregon. Smith was at all times relevant an inmate at Oregon State Penitentiary (OSP) and a patient of ODOC medical services at OSP. Smith was 61 years old at the time of his death.

6. Defendant ODOC is an agency of Defendant State of Oregon. Defendant State of Oregon is liable for the actions or inactions of its employees and agents and of ODOC and its employees and agents.

7. Defendant John and Jane Does (hereafter "the Doe Defendants") were at all relevant times medical staff at the Oregon State Penitentiary (OSP) where Smith was housed. The Doe Defendants denied Smith access to appropriate medical diagnoses and treatment, causing him pain, suffering, physical injury and death. At all relevant times, the Doe Defendants

acted under color of law and are sued in their individual capacities.

## FACTUAL ALLEGATIONS

8. Defendant ODOC is an agency of the State of Oregon. ODOC operates OSP, in Marion County, Oregon.

9. Smith did not receive any eye examination from 2013 to 2018. ODOC required inmates to pay for eye examinations and did not provide them like other medical examinations, despite the fact that ODOC controls all aspects of inmates' medical care.

10. In late 2018, plaintiff went to health services and was seen by ODOC medical staff. Smith reported that his eyesight had gradually started to become blurry in the upper right corner of his vision. Shortly thereafter, an ODOC medical staff person examined Smith and told him that he had cataracts. Smith inquired if there was any treatment for cataracts and the provider told plaintiff that many people have cataracts and that there was no treatment. Unbeknownst to Smith, he was suffering from melanoma in his eye. During this examination, medical staff did not disclose or diagnose melanoma in his eye.

11. On September 22, 2019, Smith sent a kyte to ODOC medical informing them that the blurriness in his vision had worsened so that he lost 70% of his vision in his left eye was gone. On October 1, 2019, his treating physician examined him and referred him to optometry for an appointment on October 8, 2019. Smith was referred to a retinal specialist on October 8, 2019. The retinal specialist diagnosed an eye melanoma which had grown and separated his retina from his eye, causing blurry vision.

12. On December 20, 2019, Smith was scheduled for a left eye enucleation (removal of the eye). On January 13, 2020, Plaintiff's left eye was surgically removed.

13. Smith suffered permanent loss of vision in his left eye and was permanently

disfigured. He would have to wear an eye prosthesis for the rest of his life.

14. Following this Smith brought a lawsuit in state court, Case No. 21CV12523. Despite bringing a lawsuit alleging negligence in handling his medical care, Smith did not receive adequate follow-up care. Melanoma is an extremely aggressive form of cancer with a well-known risk of metastasis. Smith did not receive regular CT scans or other testing to determine whether the cancer had metastasized.

15. On March 12, 2021, Smith sent a kyte to medical staff about it being a week with a swollen gland in his neck and wanting to see a doctor.

16. On March 16, 2021, Smith went to medical where he was seen by medical staff for the mass in this throat. Medical staff determined the mass was a "painless lymphadenopathy," that there were "[no] red flags," and asked Smith to return if there was any change.

17. On March 31, 2021, Smith sent a kyte to medical staff about it being his third week with a swollen, painful gland in his neck and how he wanted to get a blood test. Medical staff responded saying he had an appointment April 1, 2021, to see his doctor.

18. On April 8, 2021, Dr. Blair of Blue Mountain Diagnostic Imaging performed a soft tissue ultrasound of Smith's neck to inspect the right anterior neck mass. They found that it could represent a large necrotic node.

19. On April 12, 2021, Dr. Reese contacted OSP regarding the mass on Smith's neck (at this point he had had this diagnosis for 6 weeks) to propose a neck CT with contrast.

20. On April 14, 2021, Dr. Reese collected a comprehensive metabolic panel and urinalysis on Smith.

21. On April 28, 2021, Smith sent a kyte to Dr. Reese relaying information Dr. Alison Skalet told him about the melanoma cancer spreading and wanting to stay on top of it with a CT

PAGE 4 – COMPLAINT

scan/MRI every six months for the next four years.

22. On April 29, 2021, Dr. Reese's request for a neck CT with contrast was approved.

23. On May 6, 2021, a pink sheet for a CT scan was filled out by medical staff.

24. On May 13, 2021, Smith took another COVID swab test ordered by Dr. Reese and was prepped for his PRPT appointment the next day.

25. On May 20, 2021, Dr. Travis Fromwiller performed a CT scan of David's neck with IV contrast at Salem Clinic, and they recommended he get an otolaryngology consultation. Their impression of the neck mass was that it was consistent with conglomerate necrotic lymph nodes, suspicious for metastatic lymph nodes, and the source could potentially be an oropharyngeal mass or choroidal melanoma. Even if the oral pharyngeal mass did not end up representing neoplasm, it could still be metastatic nodes.

26. On May 21, 2021, a pink sheet for an otolaryngology consultation and recommendations for an oral pharyngeal mass were filled out by medical staff. A health referral to Willamette ENT was sent out for the diagnosis of an oral pharyngeal mass, multiple visits, and labs, as well as evaluation and treatment recommendations.

27. On May 24, 2021, Dr. Miller collected a comprehensive metabolic panel on Smith.

28. On May 25, 2021, Dr. Miller was contacted to make an appointment to discuss Smith's plan of care on July 21, 2021, and the pink sheet was sent.

29. On May 27, 2021, an authorization summary was approved for Smith to attend Willamette Ear Nose and Throat for two appointments regarding his oral pharyngeal mass.

30. On May 31, 2021, Smith sent a kyte to medical staff about a second gland in his neck swelling up. They responded on June 1, 2021, that he had been scheduled for a call.

PAGE 5 – COMPLAINT

31. On June 10, 2021, Smith sent a kyte to Dr. Reese reiterating how the single swollen gland now was two and the lack of medical attention he was receiving despite his situation.

32. On June 14, 2021, a pink sheet for oncology was filled out.

33. June 15, 2021, Smith took another COVID PCR test, his results were negative.

34. On June 21, 2021, Dr. Donovan of Willamette Ear Nose and Throat evaluated Smith's condition. They noted that Smith was there for a right neck mass that had been present for three months, but had reduced in size over time. They did a typical physical exam, reviewed the CT imaging of his neck, and did some blood work. They ended up performing a fine needle aspiration of the right region of his neck mass, with ultrasound guidance, and their impression was that the mass was associated with right oropharyngeal carcinoma. Smith was told to call for pathology with his PCP in a week and understood he would need treatment, such as chemotherapy or radiation, depending on the pathology reports.

35. On June 24, 2021, Smith spoke with Dr. Donovan of Willamette ENT regarding a radiation oncology referral. Nurse Veronica Curry ordered a PET scan and referral to Dr. Kang.

36. On June 28, 2021, a PA was completed by Willamette ENT for a PET scan at Salem Hospital. They completed a referral to Dr. Kang and faxed over all radiology and PA notes, as well as communications.

37. On July 7, 2021, Smith sent a kyte to the medical staff inquiring into the outcome of his visit with the ENT doctor was, or what the biopsy revealed, and medical staff responded saying he had been scheduled with his provider to discuss the issues.

38. On July 13, 2021, Smith took a COVID swab test, and the ENT requested an examination.

39. On July 19, 2021, Smith was given a health referral to Oregon Oncology to look at the new malignancy on his neck, as well as treatment recommendations. This referral was never followed through with and Smith did not receive care from Oregon Oncology until January 2022.

40. On July 21, 2021, Smith took a COVID PCR test, his results were negative. He was later seen at Pacific Pathology Associate, Inc., and a biopsy of the right region neck mass was taken, and they also performed p16 testing. On July 24, 2021, it was reported they found that the neck mass was positive for malignant cells consistent with squamous cell carcinoma, and the p16 test came back negative.

41. On July 24, 2021, Smith sent a kyte to Dr. Reese complaining of severe stomach pain that started around March 18, 2021, and that he had been anxiously waiting treatment.

42. On July 28, 2021, Smith visited the Casey Eye Institute at OHSU and was examined by Dr. Alison Skalet for a follow-up of his Choroidal malignant melanoma and enucleation of his left eyeball. At this time, he had not received a prosthetic for his left eye, and she recommended for the third time he schedule an appointment with the ocularist, Maloney's Custom Ocular Prostheses. Dr. Skalet noted that Smith had been recently diagnosed with squamous cell carcinoma (SCC) in his throat and had not received any treatment yet, but had discussed radiation and chemotherapy with Dr. Reese. Dr. Skalet recommended establishing care with medical oncology for systematic surveillance imaging to monitor his chest, abdomen, and pelvis for metastatic disease.

43. Smith did not receive imaging of his liver and lungs and did not receive treatment for cancer. Smith was repeatedly told that he was unable to attend medical appointments because of COVID though he never tested positive.

PAGE 7 – COMPLAINT

44. On July 29, 2021, Smith needed to go to the ENT for an evaluation of his mass, however there was no pink sheet. Smith was not seen again until December 2021.

45. On September 7, 2021, Smith took another COVID PCR test, his results were negative.

46. On December 2, 2021, Smith was admitted to triage with worsening abdominal pain, he was unable to sit without pain and was visibly uncomfortable. His abdomen was extremely rigid, and the nurse wanted to send him to the ER. Later, Dr. Reese approved admitting Smith to the ER at Salem Hospital and Dr. Jas Kaur examined him for abdominal pain.

47. On December 3, 2021, Dr. Seaders of Pacific Pathology Associates, Inc., performed an image-guided biopsy of Smith's left liver mass, and their interpretation confirmed it was a metastatic melanoma.

48. On December 7, 2021, Smith remained in the hospital for his abdominal pain and liver masses. He underwent a brain MRI, CT scan of his chest, and went to pathology to check for metastatic disease. Pathology revealed metastatic cancer with choroidal melanoma and extensive liver damage. He was advised to schedule an appointment with Dr. Reese as soon as possible. Later that day Smith returned from Salem Hospital to OSP and went to his housing unit instead of the infirmary. He could not be called up, and RN Will was sent up to discuss Smith's pain management plan. Smith later arrived at the infirmary, and after his options were explained he believed that his pain could be controlled. Pain medication was not available between 2000 and 0600. He was sent back to his previous housing instead of infirmary housing.

49. On December 9, 2021, Smith discussed his metastatic melanoma with his doctor and said he would be willing to undergo quarantine for immunotherapy. A non-formulary medication exception request confirms this.

50.     On December 13, 2021, Smith was experiencing severe pain. It was noted that he started taking pain medication on December 8, 2021, but that the pain was increasing to the point where the medications were not helping the pain. Dr. Reese did not feel comfortable giving him more pain medication without closer monitoring, so Smith was asked to be admitted into the infirmary. Smith refused and stated, "I will tough it out until my treatment starts."

51.     On December 14, 2021, Smith went to see a doctor to discuss his diagnosis. He repeatedly asked for pain medication, and the doctor said that in order to increase the opiates he needed to be in the infirmary for monitoring.

52.     On January 2, 2022, Smith sent a kyte to medical staff that his lesions in his throat had gotten worse that his throat was nearly closed, his feet and legs started to "fill with water," and that he could feel his heart beating through the rest of his body. He also mentioned that on January 5, 2021, his medication for oxycontin expired and he wanted to continue. Medical staff responded that he had seen Dr. Reese that day.

53.     On January 10, 2022, Dr. Reese sent a health referral to Oregon Oncology for the discussion of Smith's treatment for his stage IV melanoma.

54.     On January 14, 2022, Smith took a COVID-19 rapid test, and it came back positive.

55.     On January 20, 2022, Dr. Reese ordered a comprehensive metabolic panel, CBC w/ AMC, and platelet count for Smith.

56.     On January 24, 2022, Smith started his first dose of every three weeks Opdivo Yervoy immunotherapy and was scheduled for four cycles per Dr. William Pierce of Oregon Oncology.

57.     On January 26, 2022, a physician's order shows a venous doppler was ordered for

Smith's legs. It was performed at Salem Health Heart and Vascular Center and showed no evidence of superficial or deep venous thrombosis in the lower extremities.

58. On January 30, 2022, Smith sent a kyte to Dr. Reese asking to up his pain medication.

59. On January 31, 2022, Dr. Reese sent a referral to Oregon Oncology for a follow-up appointment for Smith prior to chemotherapy for his stage IV melanoma.

60. On February 1, 2022, Smith sent a kyte to Dr. Reese to inform him that his swollen legs had spread to swollen testicles and a disformed penis, and he asked for help.

61. On February 7, 2022, Smith was seen at Salem Hospital by Dr. Firoozi regarding acute renal failure, hyperkalemia, hypoglycemia and was admitted to the ICU. Dr. William Pierce of Oregon Oncology Specialists also treated him. He was diagnosed with hyperkalemia and his increased renal cortical echogenicity was consistent with medical renal disease. At the time he wanted to consider continuing his treatment, the next dose was supposed to be given in four days, and did not want to move to comfort care. Dr. Pierce said the outlook was "very poor," and he would likely die in a matter of weeks.

62. On February 10, 2022, Dr. Nicole Forth spoke with Smith about his prognosis, and Smith decided move to comfort care. He wanted to speak with his son, Dr. Forth spoke with him and his son said he could not come to the hospital until Saturday (February 12). Smith filled out the advance directive form and put his son in charge of his care, and his father next in line. The plan was to discharge him the next day to receive hospice care at his facility.

63. On February 11, 2022, Dr. Nicole Forth signed a DNR for Smith. His son was scheduled to visit the next day. He entered hospice. Progress notes describe that his doctor informed Smith that the chemotherapy had a one in ten chance of working, so he chose comfort

care. Smith died that day.

## CLAIM I

### Negligence – against Defendant State

64. Plaintiff re-alleges all previous relevant paragraphs as if fully stated herein.

65. Defendant's treatment of Smith fell below the applicable standard of care and was negligent in failing to diagnose Smith with retinal melanoma and misdiagnosing his condition as cataracts.

66. Defendant knew or should have known that Smith's rapid, progressive loss of vision was not the product of cataracts and should have performed imaging such as an MRI to ascertain the cause of Smith's condition. Defendant should have followed up with further examination to determine the progression of the vision loss. Because of defendant's failure to diagnose malignant melanoma, plaintiff suffered physical harm, including damage to his eye and loss of vision. Defendant knew or should have known that failing to promptly provide adequate care to Smith would result in his suffering physical harm, including loss of vision, and severe physical and mental pain and suffering.

67. Defendant should have quickly provided care to treat the cancerous mass in his throat and performed routine imaging to screen for metastases. Defendant should have but did not provide immediate diagnostic and medical treatment for Smith's abdominal pain and his neck mass. Defendant should have provided follow-up care and treatment for his cancer, which did not happen. Smith did not receive cancer treatment until 17 days before his death, despite the fact that he displayed symptoms of metastasis 11 months prior. Because of defendant's failure to timely diagnose and treat his cancer, Smith suffered physical harm and death. Defendant knew or should have known that failing to promptly provide adequate care to Smith would result in his

suffering physical harm, including severe physical and mental pain and suffering and death.

68. Defendant failed to use reasonable care in providing medical care to Smith as alleged above. Defendant's conduct was negligent.

69. Defendant owed Smith a higher standard of care because of the nature of incarceration. As a ward of the State, Defendant manages all aspects of Smith's health care, and decides when a request for a medical appointment should be granted. Had Smith been a free person, he would have sought the appropriate treatment immediately; if he had done so he would have discovered Defendant's medical error and had sought appropriate care elsewhere. However, as an incarcerated person, when Smith sought treatment while in Defendant's facility, his pleas for treatment were unmet. Defendant voluntarily took the custody of Plaintiff under circumstances such as to deprive Smith of normal opportunities for protection, and created a non-delegable duty to ensure that Smith was able to access adequate medical care while incarcerated. Defendant did not meet its obligation to provide for "healthcare, including medical, dental, mental health care and pharmacy services, that compl[ies] with appropriate professional standards." OAR 291-124-0016(1)(c).

70. Defendant's conduct was unreasonable considering the risk of harm to Smith. Defendant controlled all aspects of Smith's medical care. Smith's vision loss, pain, suffering and death could have easily been prevented by providing timely referrals to outside providers and care recommended by those providers. Instead, Defendant unreasonably ignored a very dangerous medical issue.

71. As a direct and proximate result of Defendant's negligence, Smith suffered physical harm, severe physical and mental pain and suffering, and death. Defendant's failure to diagnose and treat Smith's condition sooner resulted in permanent damage to Smith's vision,

physical harm, severe physical and mental pain and suffering, and death.

72. Smith satisfied the requirement to provide Defendant with a timely Tort Claims Notice by filing the instant lawsuit within the time permitted by law.

73. Defendant's conduct was a substantial factor in causing harm to Smith.

74. As a result of Defendant's conduct, Plaintiff suffered economic and non-economic damages in an amount to be proved at trial.

75. Plaintiff is entitled to a prevailing party fee, his costs and his disbursements.

76. Plaintiff should be fully and fairly compensated for these non-economic damages in a sum that is just as determined by a jury; here alleged to be $2,500,000. Plaintiff should be fully and fairly compensated for these economic damages in a sum that is just as determined by a jury; here alleged to not exceed $25,000.

## CLAIM II

### 42 U.S.C. § 1983 – Eighth Amendment – against Doe Defendants

77. Plaintiff realleges and incorporates each previous paragraph.

78. The Eighth and Fourteenth Amendments impose a duty on jail officials to provide humane conditions of confinement, including adequate medical care.

79. The Doe Defendants were deliberately indifferent to Smith's serious medical needs by failing to provide him with necessary diagnostic care and treatment of his cancer, causing him pain, suffering, loss of chance of survival, and death.

80. As a result of the Doe Defendants' deliberate indifference, Smith endured and suffered severe physical and emotional distress, his medical condition was pathologically worsened, and he suffered a preventable death. Plaintiff has been denied Smith's love, society and companionship. The estate incurred medical expenses and funeral expenses. The estate is

entitled to economic and noneconomic damages in an amount to be determined at trial.

81. Defendants have shown reckless and callous disregard and indifference to inmates' rights and safety and are therefore subject to an award of punitive damages to deter such conduct in the future.

82. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER

WHEREFORE, Plaintiffs demand a trial by jury and pray for judgment against Defendants as follows:

   a. Compensatory damages;

   b. Punitive damages;

   c. Attorney fees, costs and disbursements; and

   d. any other relief as the court deems just and proper.

DATED: July 18, 2023

*s/ John Burgess*
Carl Post, OSB No. 061058
carlpost@lawofficeofdanielsnyder.com John Burgess, OSB No. 106498
johnburgess@lawofficedanielsnyder.com
Tel: (503) 241-3617 / Fax: (503) 241-2249
Attorneys for Plaintiff